AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

2930 S. High Street, Columbus, OH 43207,
LV Lounge & Grill,
Including all Outbuildings and Curtilage

)
)
)
)
)
)

Case No.  2:24-mj-383

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A

located in the _____ Southern _____ District of _____ Ohio _____ , there is now concealed *(identify the person or describe the property to be seized):*

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to Distribute, or Possess with Intent to Distribute, a Controlled Substance |
| 21 U.S.C. § 841(a)(1) | Distribute, or Possess with Intent to Distribute, a Controlled Substance |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

ROBERT KUKOV  Digitally signed by ROBERT KUKOV
Date: 2024.08.06 09:23:56 -04'00'

*Applicant's signature*

Robert Kukovec, Special Agent (HSI)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(spec.*

Date: _____ August 6, 2024 _____

City and state: _____ Columbus, Ohio _____

Kimberly A. Jolson
United States Magistrate Judge

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR A SEARCH WARRANT

### (Search Warrant at 2930 S. High Street, Columbus, OH 43207 - LV Lounge & Grill)

I, **Robert Kukovec**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with Homeland Security Investigations (HSI) within the United States Department of Homeland Security (DHS).  I have been employed as a Special Agent since April 2002, and I am currently assigned to the HSI office in Columbus, Ohio.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search or seizure warrant.  I am currently assigned to a multi-jurisdictional narcotics task force in the central Ohio area, and I am cross designated to investigate violations of Title 21 of the United States Code.  Prior to my employment with HSI (and formerly U.S. Customs), I was employed as a police officer in the state of Ohio for approximately 8.5 years.  My responsibilities and duties include the investigation and enforcement of federal laws and regulations related to customs and immigration violations, including but not limited to narcotics, financial crimes, fraud, and violations of the Immigration and Nationality Act.

2.      The information set forth in this affidavit is based upon my knowledge, training, experience, and participation in investigations involving the smuggling, possession, distribution, and storage of narcotics and narcotics proceeds.  This information is also based on the knowledge, training, experience, and investigations conducted by fellow law enforcement officers, which have been reported to me either directly or indirectly.  I believe this information

to be true and reliable. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. Your affiant did not withhold any information or evidence that would negate probable cause. I know it is a violation of 21 U.S.C. § 846 for any person to conspire with others to knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance. I also know it a violation of 21 U.S.C. § 841(a)(1) for any person to knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance.

## PURPOSE OF AFFIDAVIT

3.     This Affidavit is made in support of an application for a warrant to search and seize evidence from the premises commonly known as the **LV Lounge & Grill**, a commercial property located at **2930 S. High Street, Columbus, OH 43207** (hereafter referred to as the **"TARGET LOCATION"**). This premises is more fully described in Attachment A incorporated herein by reference. A list of the specific items to be seized from the **TARGET LOCATION** is attached hereto as Attachment B, and Attachment B is incorporated herein by reference.

4.     Based upon the information below, I have probable cause to believe that inside the **TARGET LOCATION** there is property that constitutes evidence of the commission of a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and property designed or intended for use, or which is or has been used as a means of committing a criminal offense. Specifically, I have probable cause to believe that within the **TARGET LOCATION** there is evidence of violations of 21 U.S.C. § 846, conspiracy to knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance

and 21 U.S.C. § 841(a)(1), knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance (together, hereinafter the "Target Offenses").

5. Based on my training and experience, I am familiar with the methods used by persons involved in the illicit distribution of controlled substances and as a result, know the following:

    a. It is common practice for drug traffickers to often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" to obtain telephone service, utility service, and other services to hide the true identity of the owner or person who will use the service.

    b. It is common practice for drug traffickers to hide their assets, their addresses, their telephone numbers, and cellular services by using other person's names in order to avoid detection by law enforcement officials.

    c. It is common practice, that even though these assets are in nominee names, drug traffickers will continue to utilize these assets by exercising dominion and control over them.

    d. It is common for drug traffickers to provide false information to law enforcement officials regarding their identity and the address of their actual residence.

    e. It is common practice that drug traffickers possess large amounts of U.S. Currency in order to finance their ongoing illicit drug business.

    f. It is common practice that drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other documents relating to

3

the transportation and distribution of drugs. Drug traffickers commonly front (provide drugs on consignment) to their clients. The books, records, receipts, notes, ledgers, and other documents are kept where the drug traffickers have ready access to them.

g. That persons involved in drug trafficking conceal from law enforcement in their residences, vehicles, and businesses the following items: drugs, large amounts of currency, financial instruments, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to the acquisition and concealment of large sums of money resulting from drug trafficking activities.

h. When drug traffickers amass large proceeds from the sale of drugs, they attempt to hide the true source of these profits, otherwise known as laundering the money. To accomplish this, drug traffickers many times utilize banks and/or financial institutions with their attendant services, including but not limited to, cashier's checks, money drafts, and letters of credit. Other entities used to launder drug proceeds include real estate firms and purported legitimate business fronts.

i. Drug traffickers commonly travel to facilitate their trafficking activities. After purchasing drugs, traffickers commonly transport, or cause to be transported, drugs to areas in which they will be distributed. Common methods of transportation include, but are not limited to, commercial airlines, and rental/private automobiles.

j.  It is common practice that drug traffickers commonly maintain books and similar documents which reflect names, addresses, and/or telephone numbers of their associates in the drug trafficking organization. This information can often be stored in cellular phones in places such as the contacts list.

k.  Drug traffickers often take, or cause to be taken, photographs of themselves, their associates, their property, and their product, and that the photographs are usually maintained at the residences and/or businesses of drug traffickers. Photographs such as these can commonly be found and stored in cellular phones.

l.  Drug traffickers commonly have in their possession, (that is on their person, at their residence, and/or their business) weapons, including firearms of various types. Firearms are used to protect and secure a drug trafficker's property which may include, but is not limited to, narcotics, jewelry, narcotics paraphernalia, books, records, and U.S. Currency.

m.  Drug traffickers frequently maintain hidden compartments within their residence and vehicles to hide drug trafficking evidence (money, ledgers, drugs, etc.), bury evidence in containers such as shoe boxes, or hide the evidence in safes.

n.  The exact quantities, prices, dates, and methods of delivery of drugs are seldom discussed in detailed terms over the telephone. These details are usually agreed upon during face-to-face transactions. For this reason, most telephone conversations regarding drugs are very brief and often in code,

understood by the traffickers and designed to mislead or confuse non-participants of the conversations. Drug traffickers make extensive use of cellular phones and text messaging beepers/pagers to facilitate contacting one another. The structure of a drug distribution organization usually consists of sources of supply, wholesale distributors, retail distributors, and the ultimate consumers. The wholesale distributors often have more than one source of supply, and likewise the retail distributors often obtain drugs from more than one wholesale distributor. After receiving a quantity of drugs, the source of supply will often move the drugs to a location other than where he/she sells them to the wholesale distributors. The location of the source of supply's so-called "stash house" is generally a well-guarded secret known only to the source of supply and his closest associates. Most of the drugs, as well as diluting and packaging materials and weighing equipment, are usually kept at the "stash house." Only those amounts needed for immediate sale are usually kept at the point of sale.

o. Drug traffickers frequently use rental vehicles for everyday travel and will maintain another vehicle, usually at an out of sight location, to facilitate their drug trafficking business.

p. Evidence of past communication between drug traffickers can be found in saved or deleted text messages, call logs, and other forms of electronic communication occurring over, stored in, or accessed by the cellular phone.

**PROBABLE CAUSE**

8.     In 2021, investigators with the Westerville Police Department (WPD) received information from several confidential sources that Sa'd Malik WATKINS was supplying several drug houses around the central Ohio area with large amounts of narcotics. Based on this information and further investigation by multiple different federal, state, and local law enforcement agencies, investigators developed information about a large-scale drug trafficking organization (DTO) operating in the central Ohio area distributing bulk fentanyl, methamphetamine, cocaine, heroin, and marijuana obtained from Mexico to various local narcotics dealers throughout the Southern District of Ohio. WATKINS was identified as one of these local DTO members. WATKINS has a history of drug trafficking offenses and associates of WATKINS have numerous previous encounters by law enforcement resulting in the seizures of various narcotics. WATKINS was specifically known for supplying and distributing a signature "purple" colored fentanyl powder. Homeland Security Investigations in Columbus, Ohio (HSI Columbus) and the Delaware County Drug Task Force (DCDTF) joined the WPD in reference to the investigation of WATKINS.

9.     The Columbus Police Department Narcotics Unit (CPD Narcotics) also advised investigators that WATKINS was a target of their investigation back in 2019. Their investigation revealed that Cory JEWELL was stopping at a location where WATKINS was residing at 70 McMillen Avenue in Columbus, Ohio to pick up narcotics to sell from his own residence in Columbus, Ohio. Investigators were also provided information from three (3) confidential sources that WATKINS was providing large amounts of narcotics to ███████ ███████ who lived at ███████████████ in Columbus, Ohio, and who was linked to 70 McMillen Avenue.

10.     In September 2022, based on the investigation into █████ and other related suspects, the DCDTF and HSI Columbus executed State of Ohio search warrants at 70 McMillen Avenue (Apartment A and Apartment C) in Columbus, Ohio.  During the search of these two (2) apartments, investigators located large amounts of illicit narcotics that were believed to be supplied by WATKINS, including "purple" fentanyl.  In Apartment C, investigators recovered 480.38 grams of fentanyl, 353.76 grams of methamphetamine, 92.92 grams of fentanyl analogue, 18.62 grams of cocaine, seven firearms (one reported stolen), magazines, ammunition, $1,245 in U.S. currency, a blender, and multiple cellular phones.  In Apartment A, investigators recovered 12.77 grams of fentanyl, 1.06 grams of a fentanyl mixture, approximately one (1) gram of methamphetamine, a kilogram press, narcotics packaging, and ammunition.  SUSPECT #1, an individual linked to the apartments, advised investigators that WATKINS was █████ supplier for drugs at both ███████████ and the apartments at 70 McMillen Avenue.

11.     In October 2022, the WPD executed a State of Ohio search warrant on ███████ residence at ██████████ in Columbus, Ohio.  Investigators located and seized 1,076.06 grams of methamphetamine, 483.18 grams of fentanyl (404.01 grams consisting of "purple" fentanyl), 59.63 grams of cocaine, Buprenorphine strips, nine (9) firearms, suspected marijuana, approximately $8,000 in U.S. currency, cutting agents, drug packaging materials, and four cellular phones.  Investigators eventually interviewed both █████ and another suspect (SUSPECT #2) who resided and/or operated out of ████████████ in Columbus, Ohio.  █████ advised that several suspects were selling narcotics out of her residence at ████████████, and that "maybe" she was as well.  █████ stated WATKINS had recently purchased a "club" (later determined to be the **TARGET**

8

**LOCATION**). SUSPECT #2 advised investigators that they were getting "purple" fentanyl from WATKINS in chunks, and they were pressing it in Apartment A on McMillen Avenue before it got "raided." SUSPECT #2 also stated that ▮▮▮▮▮ would meet WATKINS in the area of Polaris Parkway at least twice a week to pick up drugs from him. The apartment where WATKINS had been staying at that time was located near Polaris Parkway at 918 Chillingham Drive in Westerville, Ohio (The Ravines at Westar).

12. Ring video obtained from inside ▮▮▮▮▮ residence during the search warrant at ▮▮▮▮▮▮▮▮▮ in Columbus, Ohio also showed WATKINS meeting with ▮▮▮▮ inside the house in September 2022. During that same time frame, text messages obtained from ▮▮▮▮ phone to SUSPECT #2 revealed she was telling him/her that WATKINS was there and that he could "friend you 10 purple" (meaning loan or "front" him/her "10" of the "purple" fentanyl based on your affiant's training and experience). Further review of ▮▮▮▮ text messages revealed that WATKINS was supplying ▮▮▮▮ with "purple" fentanyl. Further review of the Ring video from inside ▮▮▮▮ residence from September 1, 2022, through October 19, 2022, revealed numerous conversations that involved WATKINS (also known as "D"). The conversations included getting money to WATKINS and picking up narcotics from WATKINS. ▮▮▮▮ died of a drug overdose in January 2023.

13. Between July 2023 and December 2023, electronic surveillance of WATKINS observed him at the following locations on numerous occasions: Antigua Drive at the Island Club Apartments in Columbus, Ohio; Liberty Street at the Liberty Place Apartments in Columbus, Ohio; Riding Club Lane in Whitehall, Ohio; the **TARGET LOCATION**; and at his listed address at 2101 Argyle Road in Columbus, Ohio.

14.     In early February 2024, investigators were contacted by CPD Narcotics, who advised that WATKINS was observed coming and going from the Liberty Street Apartments in Columbus, Ohio.  CPD Narcotics had a confidential informant (CI) in a different case that ran into WATKINS, and WATKINS was allegedly in possession of a large amount of "purple" fentanyl in this apartment.  CPD Narcotics also advised that they observed WATKINS at the Liberty Street Apartments on several occasions while conducting surveillance on JEWELL in a separate narcotics investigation, and they believed that JEWELL appeared to be associated with WATKINS.

15.     A CPD analyst provided investigators with WATKINS' social media information (TikTok account "sajefebitch") where there were several videos of WATKINS holding a significant amount of U.S. currency.  WATKINS was also in photos with JEWELL and Dustin BABCOCK, who resided in another apartment at the Liberty Street Apartments. All three subjects were in a video showing them in New York City with BABCOCK wearing a red Big Baller Entertainment sweatshirt.  Big Baller Entertainment LLC was a business established by WATKINS.  A confidential source advised investigators that WATKINS purchased a large gold and silver necklace with unknown gemstones that said "Big Baller Entertainment" for approximately $50,000 in cash while in New York City during that time.

16.     On February 21, 2024, CPD Narcotics executed a search warrant at 220 Liberty Street, Apartment 10206, in Columbus, Ohio that was linked to JEWELL.  During the search, investigators discovered and seized 2,533.86 grams of fentanyl (547.92 grams "purple" fentanyl), 79.96 grams of Psilocyn mushrooms, ten (10) firearms, ammunition, magazines, suppressors, miscellaneous paperwork, a drug press, a Tyvek suit, a vacuum sealer, and other narcotics related equipment.  This was also the apartment that WATKINS had previously been

observed leaving by CPD Narcotics. The billing address for the apartment came back to 2101 Argyle Drive in Columbus, Ohio, which was the home address listed for WATKINS.

17. The CPD Lab examined fingerprints that were located on a vacuum sealer located in the bedroom where the narcotics and a firearm were found during the search warrant at 220 Liberty Street, Apartment 10206, in Columbus, Ohio. The examiner found that the latent prints were a match to WATKINS. Further lab results from the Ohio Bureau of Criminal Investigation and Identification (BCI&I) Lab discovered fingerprints located on documents found inside the bag that contained the fentanyl, which were a match to WATKINS as well. There was also DNA collected from the Tyvek suit located in the same room as the narcotics in the apartment, and the DNA was a match to WATKINS.

18. On March 5, 2024, CPD Narcotics observed BABCOCK arriving in a vehicle at the **TARGET LOCATION** which was believed to be owned and operated by WATKINS. Investigators observed an individual exit the vehicle along with BABCOCK and open the trunk area of the vehicle. WATKINS then exited the **TARGET LOCATION** and entered the vehicle sitting in the front passenger seat. All three then left the area.

19. While conducting electronic surveillance in March 2024, WATKINS' red 2021 Mercedes-Benz GLE (Ohio registration KDB2362), was observed on numerous occasions at The Pierce Apartments, Antigua Drive, his address at 2101 Argyle Drive, and the **TARGET LOCATION** all in Columbus, Ohio. WATKINS went to the **TARGET LOCATION** almost daily which was owned/operated by him based on the business records, but the liquor license appeared to still be pending approval and filed under his mother's name since he was a convicted felon.

20.     In April 2024, investigators continued to receive information from a reliable CS who had previously provided information about WATKINS.  The CS advised that he/she observed a known individual arrive at the **TARGET LOCATION** to meet with WATKINS. WATKINS provided the known individual with an unknown amount of narcotics.  The CS stated that WATKINS was possibly storing the narcotics at the **TARGET LOCATION** in the back room as he/she saw him take a significant amount of money into the back room that came in from a suspected drug house, and since WATKINS also supplied the narcotics from the back room.

21.     On April 22, 2024, HSI Columbus obtained a search warrant for the installation and monitoring of a tracking device on the red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) belonging to WATKINS through the U.S. District Court in the Southern District of Ohio.  Prior to this, all tracker warrants, and any other court orders and warrants, were obtained through the State of Ohio by the WPD.

22.     WATKINS continued to engage in the same pattern of activity and continued to utilize his red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) to conduct his drug trafficking activities.  Based on several cooperating sources, WATKINS was still utilizing both the 2101 Argyle Drive in Columbus, Ohio, and the **TARGET LOCATION** to continue to breakdown and/or distribute fentanyl, and his apartment at 321 E. Capital Street, Apt. 611, in Columbus, Ohio to stay and reside in overnight.  In late May 2024, investigators conducted a controlled buy of 103.20 grams of "purple" fentanyl from WATKINS at the **TARGET LOCATION** utilizing another CS.  WATKINS arrived at the **TARGET LOCATION** in the red Mercedes-Benz GLE to conduct the transaction with the CS inside the business.  WATKINS provided the CS the fentanyl up front to be paid back later after the CS sold the fentanyl.

23.     On June 7, 2024, HSI Columbus obtained a renewal for the search warrant for the installation and monitoring of a tracking device on the red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) belonging to WATKINS through the U.S. District Court in the Southern District of Ohio.

24.     Since that time, WATKINS continued to be engaged in the same pattern of activity and continued to utilize his red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) to conduct his drug trafficking activities.  Based on several cooperating sources, WATKINS was still utilizing both the 2101 Argyle Drive in Columbus, Ohio and the **TARGET LOCATION** in Columbus, Ohio to continue to breakdown and/or distribute fentanyl, and his apartment at 321 E. Capital Street, Apt. 611, in Columbus, Ohio to stay and reside in overnight. In June 2024, investigators provided the CS with $4,500 to pay WATKINS for the fentanyl that was previously "fronted" to the CS in May 2024.  WATKINS arrived at the **TARGET LOCATION** in his red Mercedes-Benz GLE to meet with the CS inside the business to collect the money.

25.     On July 22, 2024, HSI Columbus obtained a renewal for the search warrant for the installation and monitoring of a tracking device on the red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) belonging to WATKINS through the U.S. District Court in the Southern District of Ohio.

26.     During surveillance, WATKINS was never observed going to any place of employment on a daily basis, except for the **TARGET LOCATION**.  However, there was hardly any traffic in and out of that business to support its operation, and it did not even have a liquor license yet.

27.     A review of tax records received from the Ohio Department of Taxation for the last several years indicated that WATKINS had not filed any taxes or reported any income, either personally or through any of his listed businesses (including the **TARGET LOCATION**).  However, WATKINS had numerous photographs of himself on social media with large amounts of cash and expensive, flashy jewelry like the "Big Baller Entertainment" necklace he purchased last summer for approximately $50,000 in cash in New York City.

28.     During the course of this investigation, investigators noticed that WATKINS changed the registration on his red 2021 Mercedes-Benz GLE (Ohio registration KDB2362) from his own name to one of his business names, Big Baller Entertainment LLC.  WATKINS purchased the red Mercedes-Benz GLE in or around May 2022, and obtained a vehicle loan.  A review of financial records revealed that WATKINS made higher monthly payments than required (e.g., $1,000.00, $2,000.00, and $3,000.00) to pay off the vehicle loan.

29.     WATKINS has several bank accounts with balances in the total amount of approximately $150,000.   WATKINS deposited large sums of money into various bank accounts from unknown sources.  The majority of the funds are in two (2) accounts belonging to WATKINS' minor children, which he controlled as a joint owner.  Investigators reviewed financial records for several of his bank accounts and observed what appears to be WATKINS' process of introducing narcotics proceeds into ordinary bank channels and using such proceeds at times to pay utilities and/or rent at the Liberty Place and Pierce Apartments.

30.     Investigators have probable cause to believe that the money in WATKINS' bank accounts, the money used to purchase the red Mercedes-Benz GLE, and the money used to purchase the expensive "Big Baller Entertainment" necklace all came from narcotics proceeds due to the lack of any legitimate source of income that could be discovered for WATKINS.

Furthermore, the red Mercedes-Benz GLE was used by WATKINS to transport narcotics, and this vehicle and the various bank accounts were used to facilitate his drug trafficking activities.

31.     Based on your affiant's training and experience, drug traffickers often maintain residences which are used as "stash houses" or locations for drug storage and distribution, and use "nominees" or fraudulent identifications to obtain residences, telephone service, utility service, and other services to hide the true identity of the owner or person who will use the residences or services.

32.     Therefore, there is probable cause to believe that inside the **TARGET LOCATION** there is property that constitutes evidence of the commission of a criminal offense; contraband, the fruits of crime, and things otherwise criminally possessed; and property designed or intended for use, or which is or has been used as a means of committing a criminal offense.  Specifically, I have probable cause to believe that within the **TARGET LOCATION** there is evidence of violations of 21 U.S.C. § 846, conspiracy to knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance and 21 U.S.C. § 841(a)(1), knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance. This information is based on the fact that multiple independent cooperating sources provided information that WATKINS utilized the **TARGET LOCATION** to store and/or distribute narcotics and/or narcotics proceeds, investigators conducted a controlled buy of fentanyl from WATKINS at the **TARGET LOCATION** at the end of May 2024 and then dropped money back off at the **TARGET LOCATION** in June 2024 for the previously purchased fentanyl utilizing a CS, and that WATKINS still maintained the same pattern of behavior and was still continuing to travel and spend time at both 2101 Argyle Drive in Columbus, Ohio and the

**TARGET LOCATION** based on both electronic surveillance and information from multiple cooperating sources.

**CONCLUSION**

33.　　Based on the facts set forth in this Affidavit, there is probable cause to believe that beginning on an exact date unknown but at least 2022 and continuing up to and including through the present, in the Southern District of Ohio and elsewhere, WATKINS and other subjects, both known and unknown, conspired to knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance, in violation of 21 U.S.C. § 846 and knowingly or intentionally distributed, or possessed with intent to distribute, a controlled substance, in violation of 21 U.S.C. § 841(a)(1).  Furthermore, there is probable cause to believe that within the **TARGET LOCATION** there is evidence of violations of the Target Offenses, contraband, fruits of the Target Offenses, and property designed for use, intended for use, and used in committing the Target Offenses.

ROBERT KUKOVEC
Digitally signed by ROBERT KUKOVEC
Date: 2024.08.06 09:28:11 -04'0

Robert Kukovec
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on this ___6th___ day of ___August___, 2024.



Kimberly A. Jolson
United States Magistrate Judge

# ATTACHMENT A

## DESCRIPTION OF PREMISES AND PROPERTY TO BE SEARCHED

The property to be searched is **2930 S. High Street, Columbus, OH 43207 (LV Lounge & Grill)** along with the curtilage of the property or any detached outbuildings. The premises is described as a single-story business within the Southgate Shopping Plaza consisting of approximately five separate addresses between 2920 and 2934 S. High Street in Franklin County, Ohio (Parcel ID #010-112388-00) within the Southern District of Ohio. The structure is comprised of green painted cinder blocks and red brick walls with a green colored overhang awning across the entire shopping plaza with 2930 S. High Street being the second unit from the south in the shopping plaza. The structure is located on the south side of Columbus, Ohio that sits on the east side of S. High Street facing west between Southgate Drive and Ziegler Avenue. The white outlined numerals on a black background "2930" are displayed between the two glass entry doors to the business right under a large white sign on the awning above the doors with a black and gold overlayed "LV" logo followed by gold lettering displaying "LOUNGE & GRILL." The back of the shopping complex and the back door to 2930 S. High Street faces Thorndale Avenue to the east.



# ATTACHMENT B
## ITEMS TO BE SEIZED

All fruits, evidence, and instrumentalities, as listed below of criminal offenses against the United States, that is 21 U.S.C. § 846, conspiracy to knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance and 21 U.S.C. § 841, knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance. Those items include:

1. Controlled substances, materials that drugs were shipped in and/or used to package for sale, drug paraphernalia used to administer or ingest controlled substances, and equipment related to the sale, manufacture, processing and storage of controlled substances, including but not limited to all cooking equipment, chemicals, packaging materials, scales, presses, adulterants, diluents, strainers, measuring spoons, scales, grinders, etc.

2. Logbooks, records, payment receipts, notes, and/or customer lists, ledgers and other papers relating to the transportation, ordering, purchasing, processing, storage and distribution of controlled substances.

3. Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and other items relating to travel to obtain and distribute narcotics and narcotics proceeds for the past five years. Evidence of such travel is often times maintained by narcotics traffickers in the form of airline receipts, bus tickets, automobile rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, logs, travel agency vouchers, notes, cellular telephone tolls.

4. Books, records, invoices, receipts, records of real estate transactions, auto titles, financial statements, bank statements, cancelled checks, deposit tickets, passbooks, money drafts, withdrawal slips, certificates of deposit, letters of credit, loan and mortgage records, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, wire transfer applications and/or receipts, fictitious identification, and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money. These records should include both records of drug trafficking, and the manufacturing of fraudulent identification documents.

5. Electronic equipment, such as, telephone caller identification boxes, video and audiocassette tapes, pagers (digital display beepers), and any stored electronic communications contained therein.

6. Cellular telephone(s) and/or portable cellular telephone(s) and any stored electronic communications contained therein.

7. United States currency, precious metals, jewelry, gold coins, and financial instruments, including, but not limited to, stocks and bonds.

8. Photographs of co-conspirators, assets and/or narcotics, including digital photos or videos, still photos, negatives, videotapes, films, slides, undeveloped film and the contents therein.

9.  Address and/or telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of co-conspirators, sources of supply, storage facilities, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists.

10. Indicia of occupancy, residency, rental and/or ownership of the premises described above or vehicles located thereon, including, but not limited to, utility and telephone bills, cancelled envelopes, keys, deeds, purchase lease agreements, land contracts, titles and vehicle registrations.

11. The opening, search and removal, if necessary, of any safe or locked receptacle or compartment, as some or all of the property heretofore may be maintained.

12. Any and all computers and information and/or data stored in the form of magnetic or electronic coding on computer media, on media capable of being read by a computer, or other recorded media.  This includes but it is not limited to computer software, software manuals, tapes, CD's, diskettes, stored electronic communications, taped messages, electronic date/memo minders, address books, word processors, passwords, backup storage devices, audio tape and the contents therein, containing the related information generated by the aforementioned electronic equipment.

13. Firearms and ammunition, including but not limited to handguns, pistols, revolvers,

rifles, shotguns, machine guns and other weapons and any record or receipt pertaining to firearms and ammunition.

14. Any other items which constitute evidence of violations of 21 U.S.C. § 846, conspiracy to knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance, and 21 U.S.C. § 841, knowingly or intentionally distribute, or possess with intent to distribute, a controlled substance.